307 So.2d 132 (1974)
K. W. BRADLEY et ux.
v.
ALLSTATE INSURANCE CO. et al.
No. 10058.
Court of Appeal of Louisiana, First Circuit.
December 16, 1974.
Rehearing Denied February 10, 1975.
Writ Refused April 11, 1975.
Richard J. Dodson, Baton Rouge, for appellants.
John S. White, Jr., Baton Rouge, for appellees.
Before LANDRY, BLANCHE and NEHRBASS, JJ.
LANDRY, Judge.
Mr. and Mrs. K. W. Bradley (Pamela), (Appellants), appeal from judgment rejecting their demands for damages for personal injuries sustained by Mrs. Bradley, (and incidental medical expense), in an intersectional automobile collision. The accident occurred while Mrs. Bradley was riding as guest passenger in a 1971 Toyota owned and being driven by Mrs. Bradley's acquaintance, Judy Gibson. The Toyota was struck broadside by a 1971 Chrysler owned and being operated by defendant, Garry N. McClure, insured of defendant, Allstate Insurance Company. The principle issues involved in this litigation are: (1) the duty of care owned by McClure as a driver proceeding through an intersection upon a favorable traffic light; and (2) whether or not McClure's alleged intoxication impaired his driving ability and thus prevented his effective discharge of the duty incumbent upon him. The trial court found *133 that whereas McClure was shown to have been intoxicated, said circumstance was not a contributing cause to the accident. In essence, the trial court held that the accident was caused solely by the negligence of Miss Gibson who proceeded into the intersection on an unfavorable or "stop signal" at a time when McClure was so close to the intersection, the accident could not have been avoided even by a sober driver. We affirm.
Defendants urge affirmation of the result reached below and request that we reverse the trial court finding that McClure was intoxicated.
The accident occurred early (2:00 A.M.) in the morning of Sunday, May 16, 1971, at the intersection of Airline Highway (Airline), U.S. 61, a major four lane, north-south highway in the City of Baton Rouge, and Old Hammond Highway (Hammond) a paved, two lane east-west roadway. The intersection is very wide and presents unimpaired visibility from all directions. Although Airline is generally a four lane roadway, for approximately one block north and south of the intersection there are four lanes of travel. Adjacent to each inside lane of travel is a left turn lane for motorists proceeding in either direction. These left turn lanes and the principal lanes of travel for both northbound and southbound vehicles are separated by a raised curb. Adjacent to each outside lane of travel is an additional lane for motorists desiring to turn right onto Hammond. These right turn lanes are separated from the principal lanes of Airline only by painted lines. Hammond's two lanes of travel are separated merely by painted yellow lines. On the east side of Airline, Hammond has a third or right turn lane for motorists wishing to proceed north on Airline. The intersection is controlled by a traffic signal which during the time of day the accident occurred generally remains on green or "go" for traffic on Airline until changed by a vehicle passing over a pressure sensitive traffic detector plate situated in the westbound lane of Hammond 51.7 feet east of the east edge of the main right northbound lane of Airline. The record does not so show, but we assume there is a similar traffic detector plate situated in the outside eastbound lane of Hammond on the west side of Airline.
The following pertinent circumstances are either undisputed or clearly established by the evidence. The speed limit on Airline was 60 miles per hour. The Toyota stopped in the westbound lane of Hammond between the traffic detector plate and the east edge of the outside main northbound lane of Airline. The Toyota proceeded on a red or unfavorable traffic signal and was struck on its left center by the front of the McClure vehicle. Measurements taken by investigating officers fixed the point of impact at seven feet west of the easternmost edge of the right main northbound lane of Airline and 10 feet south of the north edge of the main westbound lane of Hammond. The McClure vehicle laid down fifty feet of skid marks in the outside main northbound lane of Airline prior to the point of impact. Following the collision, the McClure automobile traveled an additional 20 feet. The force of the impact shoved the Toyota in a generally northwesterly direction from the spot of the collision. McClure was administered in intoximeter test following the accident. The test indicated McClure had a weight percentage of 0.145% alcohol in his blood stream. The report made by one investigating officer indicates a faint odor of alcohol was detected on McClure's breath; that McClure exhibited a cooperative and polite attitude; that McClure showed no unusual tendencies; that the officer considered the effect of alcohol on McClure to be slight, and that the officer considered McClure fit to drive an automobile.
McClure was accompanied by his date, Gloria Boudreaux, who occupied the right side of the front seat of McClure's vehicle. McClure's acquaintance, Dominic Magazine, and Mr. Magazine's date, Mrs. Jacqueline Achord, were seated on the rear seat of McClure's car. McClure was the *134 only occupant of his vehicle who saw the Toyota prior to the accident. McClure testified he was proceeding in the outside northbound lane of Airline at a speed of about 45 miles per hour. He noted the light was green when he was still a considerable distance from the intersection and proceeded to pass through the intersection. In substance, McClure testified that all of a sudden he noticed the Toyota moving toward the intersection, and that he immediately applied his brakes full force, but could not avoid the collision. In summary, McClure testified he believed the Toyota proceeded very quickly, and that the incident happened so rapidly he could not tell where the Toyota started from, or how far the Toyota was from the outside main northbound lane of Airline when he first saw the Toyota in motion.
Miss Gibson testified that she stopped at the intersection and later proceeded on what she thought was a green light. She stated she intended to turn left on Airline and proceed to Interstate Highway 10 to the south. She frankly conceded that she did not see the McClure vehicle prior to the impact. She stated that she stopped opposite a street sign standard presently situated on the north side of Hammond. This would place her vehicle approximately 50 feet from the point of impact. It is not certain, however, that the sign presently occupies the same location it did on the date of the accident.
The accident was observed by Thomas W. Stevens, employee of a local television station. Mr. Stevens, a disinterested witness on his way home, had stopped at a cafe situated in the southwest quadrant of the intersection diagonally across from the scene of the accident. Standing in front of the cafe, Mr. Stevens' attention was attracted to the accident scene by loud talking, laughter and noises emanating from occupants of the Toyota who were engaged in conversation with the occupants of a vehicle stopped to the right of the Toyota with the intention of turning right on to Airline. Mr. Stevens estimated the Toyota was stopped approximately 16 feet west of the traffic detector switch in the westbound lane of Hammond. He observed the Toyota remain stationary in front of a line of three or four cars, while the traffic light showed a favorable signal for vehicles on Hammond. He then noted the light turn red for vehicles on Hammond whereupon motorists to the rear of the Toyota began blowing their horns. Next, Stevens observed the Toyota start forward at what he determined to be a normal rate of speed despite an unfavorable traffic signal. Stevens also stated that at the time the Toyota began to move, he estimated the McClure vehicle was 200 feet from the center line of Hammond traveling at a speed of 60 miles per hour. In effect, Stevens expressed the view that because of the positions of the vehicles when the Toyota started forward, he deemed a collision to be inevitable.
Louis Maggio was driving a vehicle stopped immediately behind the Toyota driven by Miss Gibson. We have examined in minute detail Maggio's testimony concerning the positions of the vehicles involved in the accident, and find that it does not fix these relative positions with any degree of certainty. We think, however, that in essence Maggio thought the Toyota was very near the intersection when it started forward at a normal rate of speed estimated at 10 miles per hour. We think the best analysis of this evidence is that Maggio determined the Toyota was stopped approximately 20 feet east of the east edge of the outside northbound main lane of travel on Airline. We also note Maggio's testimony that when the Toyota started to move forward, the McClure vehicle was approximately 70 to 75 yards from the intersection. Although Maggio could not estimate the speed of McClure's vehicle, he stated that he remained stationary because, when he saw the Toyota move ahead and the McClure car approaching, he knew there would be a collision. It would appear that Maggio's version of the circumstances would have made the occurrence of *135 the accident extremely unlikely. If the Toyota was only 20 feet from the east edge of the main outside northbound lane of Airline, while McClure's vehicle was 70 to 75 yards (210 to 225 feet) distant, the Toyota would have cleared the point of impact before the McClure car reached the point of collision, unless McClure was driving at an extremely fast rate. The record does not even remotely support a finding that McClure was driving in excess of the legal limit of 60 miles per hour. We are inclined to believe McClure was nearer the intersection than Maggio estimated; this finding would more nearly accord with Maggio's conclusion that the positions of the vehicles were such that when the Toyota moved ahead, the distance between the vehicles made a collision imminent.
Officer Emmet Smart, Baton Rouge Police Department, conducted a photo electric intoximeter test of McClure's breath at the scene of the accident about 40 minutes after the mishap. Smart explained in detail his training in the operation of the device and his limited knowledge of the scientific principles on which the apparatus operates. He also noted that the device actually measures the amount of alcohol found in a person's breath, which finding the machine converts into the weight percentage of alcohol in the subject's bloodstream. According to Smart, the reading on McClure showed 0.145% alcohol in McClure's blood. Smart acknowledged that certain factors such as temperature in the van in which the testing equipment is housed could vary readings to some extent.
Plaintiffs produced Professor Robert F. Borkenstein, Professor of Forensic Studies, Indiana University, who possesses impressive qualifications in the specialized field of testing blood for alcoholic content. Professor Borkenstein has designed such equipment, and is well versed in the scientific principles on which such equipment operates. He has made numerous experiments to determine the effects of alcohol in the bloodstream. He acknowledged that the test administered by Smart could perhaps be affected to minimal extent by atmospheric and bodily temperature, the availability of constant electrical current to operate the apparatus, the cleanliness of the machine's components, the purity of chemicals employed, and the presence of tobacco smoke in the subject's breath. Borkenstein was of the opinion, however, that such a device, if properly operated, would give a reliable reading. Professor Borkenstein testified that a person having 0.145% alcohol in the blood was under the influence of alcohol to the extent his ability to drive would be seriously impaired. He explained that somewhat below a 0.145% reading, the average person would be affected by alcohol to the extent driving ability was impaired. He also noted that the effect of alcohol produces a "tunneling of vision", meaning that lateral or peripheral vision is impeded. He concluded that McClure, having 0.145% alcohol in his blood, could not see the Toyota as soon as it could have been seen by a sober person. More importantly, Borkenstein stated that the real danger posed by intoxication is the reduction of the brain's capacity to assimilate sensory imputs, particularly visual imput. Although Borkenstein conceded that reflex actions are also impaired by alcohol, he did not consider such loss of particular importance. He made it clear that, in his opinion, the prime factors rendering an intoxicated driver dangerous are the loss of peripheral vision and reduction of the brain's capacity to assimilate visual imput. Although he recognized that alcohol produces varying effects on different individuals, he explained that visual symptoms such as impairment of speech and unsteadiness of gait are not the true criteria of intoxication and can be misleading. He noted that a person whose speech was unimpaired, and who walked without noticeable difficulty, could nevertheless be suffering from a tunneling of vision and marked reduction of his brain's ability to assimilate visual imput.
Ray Herd, Director, Northwest Louisiana Criminal Justice Laboratory, testified *136 on behalf of Appellants. Mr. Herd, in substance, defended in general the accuracy of intoximeter tests such as that involved in this instance. He did, however, question to some degree the accuracy of studies which attempt to correlate degrees of intoxication to differences in perception and reaction time. He noted that in tests involving sober drivers, reaction time is not a precise measure because such individuals are aware that an emergency will be presented. Herd, who is quite experienced in the field of reconstructing accidents, testified that a vehicle traveling 45 miles per hour traverses 66 feet per second. With this mathematical computation, we are in accord. Herd maintained that this accident could have been avoided had McClure applied his brakes 2.57 seconds prior to the moment of impact instead of 1.57 seconds which Herd calculated to be the case. Herd so theorized on the premise that the Toyota, traveling at 10 miles per hour from a starting point 50 feet west of the east edge of the main northbound lane of Airline, would have passed the point of collision before the McClure vehicle reached that spot, assuming McClure was traveling 45 miles per hour when he applied his brakes. In explanation, Herd noted he used a reaction time of 0.7 seconds during which the McClure car would travel 46½ feet before breaking effect began. Based on the 50 feet of skid marks made prior to impact, Herd concluded 0.87 seconds were required for the McClure car to skid 50 feet into the side of the Toyota. Therefore, according to Herd, McClure did not react to the danger until 1.57 seconds before the instant of contact. Assuming that McClure was 200 feet from the impact point when the Toyota moved forward, Herd concluded that McClure traveled 103.5 feet, while the Toyota was in motion, before McClure applied his brakes, which consumed 1.56 seconds. Consequently, Herd determined McClure wasted 1.002 seconds. In summary, Herd found that had McClure reacted 1 second sooner, the accident could have been avoided. Herd conceded, however, that if the McClure vehicle was traveling at a speed greater than 45 miles per hour, say 50, 55 or 60, the time element involved in his calculations would vary appreciably.
Defendants offered the testimony of Dr. Albert L. McQuown, Pathologist, who pointed out that the intoximeter used in this instance does not directly measure the alcoholic content of the blood, rather it measures the alcoholic content of the breath and gives a correlated reading. Dr. McQuown was highly critical of the accuracy and value of intoximeters, first, because they do not directly measure blood alcohol content, and secondly, because the accuracy of the readings can be affected by many variables. He first noted that the chemicals used are not specific for alcohol, but can also be affected by various other compounds. Dr. McQuown also observed that atmospheric and bodily temperatures can alter readings as also can a nonconstant electrical supply which operates the equipment. He further noted that the skill and training of the person administering the test can be of significance. In short, Dr. McQuown considered such tests merely screening test. He did not consider the apparatus sufficiently sophisticated to predicate conclusive results on its findings.
A motorist proceeding on a favorable traffic signal is not obligated to look to the right or left before entering an intersection, and may generally assume that a motorist on the nonfavored roadway will comply with the signal and yield the right of way. Additionally, a motorist proceeding on a favorable light will be held accountable only if he could have avoided the accident by the exercise of the slightest degree of care and fails to do so. Youngblood v. Robison, 239 La. 338, 118 So.2d 431; Bryant v. Ouachita Coca-Cola Bottling Co., 239 La. 83, 117 So.2d 919; Bourgeois v. Francois, 245 La. 875, 161 So.2d 750; Rome v. D'Antoni, 258 La. 767, 246 So.2d 331.
*137 In Rome, above, we stated the rule as follows:
"If, under the circumstances, the exercise of the slightest degree of care and caution on the part of such a driver could have avoided the accident, the driver on the favorable street is to be deemed negligent. A driver who looks and fails to see an imminent danger which is plainly visible is in no better legal position than one who could have obviated an accident by the exercise of the slightest degree of care and caution but who did not exercise any degree of care at all. Looking and failing to see that which is plainly to be seen is the equivalent of failure to exercise the slightest degree of care."
The evidence convinces us that in this instance McClure did in fact exercise such caution as the law requires in cases of this nature. It is clear that he reacted to the danger of the Toyota moving directly across his path in violation of an unfavorable traffic signal. To apply Appellants' theory in this case would require McClure to have reacted at the very instant the Toyota began to move forward. If the Toyota were 50 feet from the point of impact when it started forward at a normal rate, as plaintiffs contend, it would not necessarily have obligated McClure to apply his brakes or take evasive action simultaneously. It could well be that had movement on the part of the Toyota been detected at this precise instant, a motorist on Airline could have reasonably assumed the driver was merely pulling closer to the intersection and did not intend to cross in violation of the signal. In this instance, we find too many imponderables which Appellants have not resolved with that degree of certainty required by law. To hold that under the circumstances of this case, McClure should be held liable merely because a computation based on assumed circumstances which could well vary showed he should have reacted one second sooner would, in our opinion, place an unconscionable burden upon a motorist proceeding on a favorable traffic signal. Under the circumstances, we find that McClure acted as reasonably and expeditiously as may be legally demanded of any driver.
Assuming, solely for argument's sake, that McClure was intoxicated, we think it clear beyond doubt that such circumstance played no part in the occurrence of this accident. Regardless of his condition, we find that McClure in fact reacted to the emergency with that degree of diligence required by law. We find, therefore, a determination of McClure's sobriety is unnecessary to a decision in that matter.
The judgment of the trial court is affirmed at Appellants' cost.
Affirmed.